MARCUS, Judge.
This is an expropriation suit arising under the provisions of the “quick taking” statute, LSA-R.S. 48:441-460. The defendants owned a tract of land fronting on the east bank of the Mississippi River just south of the Town of St. Gabriel in Iber-ville Parish. The Department of Highways crossed the defendants' property in constructing Louisiana Highway 30, a two-lane highway running generally north and south. The defendants’ tract contained some 444.69 acres. It fronted approximately 700 feet on the river, had side lines of some 11,500 feet, and measured about 2,900 feet across the rear or eastern boundary. About 1,000 feet east of the river, the property was crossed by the River Road, and about 2,500 feet east of the river by a railroad track, adjacent to which ran two pipelines and a utility line. The property is bordered along its northern boundary by Louisiana Highway 74. The parcel taken for the new highway ranges in width from a little over 100 feet to just under 200 feet. It contains 3.69 acres and is a strip immediately to the east of the railroad. In the southern portion of the tract, the highway angles easterly away from the railroad leaving a triangular-shaped area of 2.097 acres between the railroad and the new highway. The large portion remaining east of the highway contains 382 acres.
A portion of the area between the River Road and the railroad is under lease to Shell Oil Company for a storage terminal. This lease covered an area of 7.3 acres and also provided for a telephone and pipeline right of way from the north side line diagonally across to the terminal area, a 50 foot right of way for loading line, telephone line, power line and road from the terminal area to the River Road and a right of way for loading line, telephone line and power line from the River Road to the river. In addition the lease grants Shell the exclusive right to use the southern 630 feet of the river frontage up to a depth of about 100 feet for the purpose of operating dock facilities. Shell has constructed a dock and is using it as a barge terminal. This lease, executed in 1942, was for a primary term of ten years with Shell having the option of renewing it for four additional ten year periods. Shell exercised its options in 1952 and 1962.
This suit was f’led on April 15, 1965. There is no dispute as to the necessity for *53 the taking. The only issue is that of just compensation. In accordance with LSA-R.S. 48:441 et seq., the Highway Department made a deposit of $5,350.00 for the land and improvements taken at the time of the filing of the suit. This deposit reflects the Department’s valuation of $1,200 per acre for the land taken with no amount included for any severance damages. The trial judge concluded that at the time of the taking the highest and best use of the property was industrial and that its fair market value was $1,500 per acre. He therefore awarded $6,385 for the 3.69 acres of land taken, which included $850.00 for improvements which were also taken. The lower court fixed severance damages to the 2.097 acres between the highway and the railroad at 50% of $1,500 an acre, or the sum of $1,572.75. In addition the trial judge found that the 382 acre tract east of the highway suffered damage in the amount of $30,000, which he found to be the additional costs an industrial user would incur because of the existence of the highway. He specifically found that it would cost an additional $5,000 to construct a railroad spur track across the highway, an additional $5,000 to lay pipes either over or under the highway, and $20,000 to construct an automatic signal system where the highway would cross the spur track. From this judgment the Department of Highways has appealed. The defendants have answered the appeal, asking only for an increase in the amount of severance damages.
Both the Highway Department and the land owners called two expert appraisers to testify as to the value of the subject property. All four of these witnesses were of the opinion that, at the time of the taking, the highest and best use for the property was industrial. The land owners’ first witness, Kermit Williams, placed a value on the property before the taking of $1,925 per acre. He testified that this figure was roughly an average of the prices paid in three sales in 1965 of nearby tracts having frontage on the east bank of the Mississippi River. The first of these was from Ben Miller to Shell Oil Company, 693 acres at $1,575 per acre. The second was from Lynwood Land Company to Wyandotte Chemical, 1,130 acres at $1,500 per acre. The third was from Leon Geismar. to the Borden Company, 141 acres at $2,500 per acre.
The second expert witness for the land owners, John Lejeune, felt that the value of the property before the taking was $2,-250 per acre. He also based his conclusion on the comparable sales mentioned above, but he arrived at a higher value than did Mr. Williams because he placed the greatest weight on the sale from Leon Geismar to the Borden Company which occurred just after the date of the taking in this case. He also mentioned the 1964 sale from Waguespack to Texaco of 1480 acres on the east bank of the river at $1,250 per acre and the 1965 sale from Schexnayder to Gulf of 577.3 acres on the west bank of the river for $1,580 per acre. He did not feel the Texaco purchase was truly comparable because it involved a tremendous tract of land, much of which required clearing. He also discounted the Gulf purchase because of its location on the west bank of the river where, he testified, there is a lesser demand for industrial property. He did not, however, explain why his valuation was so much higher than the prices paid by Shell and Wyandotte.
Julius A. Bahlinger, III, was an expert witness called by the Highway Department. In his opinion the value of the subject property at the time of the taking was $1,200 per acre. However, the comparable sales which he cited as the basis for his conclusion had occurred several years before the taking in this case. The first was from August J. Planche to Gulf States Utilities in 1957, 400 acres at $1,500 per acre. He felt that despite the increase in value of riverfront property since 1957, the price paid by Gulf States was higher than the value of the subject tract because Gulf States had been willing to pay a premium price to get this particular tract which was ideally suited to its specific needs. Mr. *54 Bahlinger’s other comparables were all sales made in 1961. Two of them had a price of $1,300 per acre, and the other had a price of $1,200 per acre. On cross examination he admitted that he had not attempted any adjustment to his comparables to allow for an increase in value over time. He testified that the time factors are very difficult to measure, but did not explain his decision to choose comparable sales which occurred several years before the taking in this case. Mr. Bahlinger admitted that the sales he cited would have involved higher prices had they occurred in 1965. The factors he pointed out which would tend to lower the value of the subject tract were the narrowness of its river frontage; its long, narrow shape; and the existence of the Shell lease.
Chester Driggers, the second expert witness called by the Highway Department, also found that the subject tract had a value of $1,200 per acre at the time of the taking. He mentioned prominently the Texaco purchase, which involved a tract over three times the size of the subject property, as well as acquisitions by Hercules Powder, Union Carbide, and Georgia Pacific at prices ranging from $1,250 to $1,300 per acre, all of which were on the west bank of the river. He also mentioned a sale from Riverside Farms to First Mississippi Corporation in 1965 at $1,300 an acre, but the size and other characteristics of the tract there involved were not given.
We are convinced by the testimony that the fair market value of the subject tract would be higher than that of a similar tract located on the west bank of the river because of the higher industrial demand for east bank property. We are further convinced that the price per acre of a larger tract, such as the property purchased by Texaco, would be generally less than the price per acre of a smaller tract. On the other hand, we feel that the values found by the witnesses for the land owners were too high because they gave too much weight to the $2,500 per acre price paid in the sale from Geismar to the Borden Company. The record shows that this tract was only 141 acres and that it was adjacent to properties already owned by the purchaser, both of which would tend to substantially increase its price. The record further reveals that the price was not only consideration for the transfer of the land, but also purchased for the buyer a right of first refusal on other property owned by the sellers. After careful consideration of all these elements, and after reflection on the significance of each of the comparable sales discussed in the record, it is our finding that the trial court committed no error in arriving at a value of $1,500 per acre for the subject tract. Accordingly we affirm that finding and hold that the fair market value of the 3.69 acres taken was $5,535.00 as of the date of the taking.
There is no dispute as to the Highway Department’s liability for the improvements taken, and little question concerning their value. The improvements involved were a catch pen, a water well with pump, storage tank and shed, and fencing. We affirm the finding of the trial judge that the value of these improvements was $850.-00; therefore, the total value of the land and improvements taken was $6,385.00.
We turn next to the question of resulting or severance damages. The expert witnesses for both sides were unanimous in the conclusion that the existence of the highway would in no way detrimentally affect the value of the portion of the property lying between the railroad track and the river. This area could still be sued for industrial purposes, although if used separately from the large portion of the tract lying east of the highway, it would be attractive only to industries seeking a relatively small tract.
As méntioned earlier, the strip taken for the new highway lies immediately to the east of the railroad track. In the southern portion of the tract, the highway angles easterly away from the railroad leaving a triangular shaped area of 2.097 acres between the railroad and the high *55 way. Because of the shallowness and the unusual shape of this portion, and because the hanked highway is several feet higher than the adjacent land, we find that this small parcel is considerably damaged by the taking. Mr. Bahlinger, who testified on behalf of the Highway Department, was of the opinion that this area had lost 50% of its value. Accordingly, we find that the trial court was clearly correct in the judgment that the 2.097 acres had suffered damage of 50%, or $750.00 per acre, for a total damage of $1,572.75.
We are in agreement with the opinions expressed by a number of witnesses that because of the positions of the River Road and the railroad track near the front of the subject tract, because of the extreme narrowness of the tract in that portion lying west of the railroad track, and because of the burden of the Shell facilities upon the area between the River Road and railroad track, any industrial user of the property prior to the taking would have necessarily located its plant in the large area to the east of the railroad track. The portion to the west of the railroad track might have been used for administrative offices, but would probably have been used mainly for storage purposes. We do not find that the addition of the highway adjacent to the railroad tract would prevent an industry from using the property in virtually this same way. We do not find this to be a situation where a highway is dividing a tract so as to render it any less useful. In effect this highway runs along the front of the part of the property where an industry would have chosen to construct its facility. This was apparently the conclusion reached by the trial judge because he felt that the severance damages to the large tract should be limited to the sum of the additional costs which an industrial user would incur because of the presence of the highway. After a careful review of the record, however, we are of the opinion that the trial court erred in awarding these damages.
In general, we find ourselves in agreement with Mr. Frank H. Kcger, a structural engineer who testified that for an industry buying a tract of land on which to construct a multi-million dollar plant, the additional costs which might be incurred because of the presence of the highway would be so negligible as to have no effect upon the purchase price. For example, the evidence offered to prove that an industrial buyer would pay $5,000 less for the property to cover the cost of crossing the highway with a spur track was extremely weak. There was no testimony that such a consideration had been of significance in other sales, or that any potential buyer had raised the issue in this case. Furthermore, there was testimony to the effect that frequently, as a result of negotiations between the industry and the railroad company, the railroad itself pays the cost of installing a spur track. It is our conclusion that the need for a spur track, the expense to the industrial user, and the influence of the factor upon the sale price of the property are all so speculative that this item of damage should not be allowed.
Our conclusions are the same with respect to the $5,000 awarded to cover the cost of elevating pipes or burying them under the highway. There was no real evidence to prove the cost of this work, nor do we feel that the effect of this item on the sale price of the property has been removed from the realm of speculation.
The final item of damages awarded by the trial court was $20,000 as the cost of installing an alarm and warning system at the intersection of the highway and the spur track. This finding was apparently based on the testimony of Marvin T. Brown, who, on the basis of his experience as a construction engineer, testified that in his opinion such a warning system would be necessary. On cross-examination, he admitted that he had not made any inquiry to determine what signals would be required at the railroad crossing, but that he had simply observed that in highways re *56 ceiving comparable travel a signal light would be necessary. To rebut this testimony the Highway Department called as a witness Frank J. Taylor, a beautification and permit engineer with the Department of Highways since 1948, who testified that his office has jurisdiction over the granting of permits for spur crossings. -He testified unequivocally that if application were made he would permit the installation of a spur track crossing the highway on the subject property, and that the only signal device which would be required would be the installation of “cross buck signs and double flagging of traffic during train movement.” He stated that he could not foresee when any additional warning devices might be required. He pointed out the existence of a spur track crossing this same highway and servicing Louisiana State University in Baton Rouge and noted that there was no signal required at that crossing. The testimony of Mr. Taylor that no elaborate alarm system would be required was authoritative and convincing. Accordingly, we cannot agree with the trial court’s award of $20,000 for this system. We find, rather, that the land owners have failed to carry the burden of proving this item of damage by a preponderance of the evidence.
Price LeBlanc, a witness called by the land owners, testified that subsequent to the taking he had been granted an option to purchase the large tract to the east of the new highway for residential purposes. He further testified that, prior to the trial of this case, he had exercised his option to purchase the land for a price of $1,650 per acre.
LSA-R.S. 48:453 provides that, in expropriations under the “quick taking” statute, the measure of compensation shall be as follows:
“The market value is determined as in general expropriation suits but as of the time the estimated compensation was deposited in the registry of the court.
Damage to the remainder of the property is determined as of the date of the trial.
In either case the defendant has the burden of proving his claim.”
It is clear that under this statute damages to the remainder of the property are determined as of the date of the trial. State Through Department of Highways v. Baddock, 170 So.2d 5 (La.App. 1st Cir. 1964); State Through Department of Highways v. Anding, 189 So.2d 445 (La.App. 3d Cir. 1966); State Through Department of Highways v. Reuter, 175 So.2d 316 (La.App. 4th Cir. 1965); State Through Department of Highways v. Huson, 166 So.2d 3 (La.App. 2d Cir. 1964).
In this case we have determined that the fair market value at the time of the taking was $1,500 per acre. We have noted that prior to the trial an option was exercised to buy the property east of the new highway for residential purposes for $1,650 per acre. This fact confirms our belief that the highway caused no severance damages to this tract (except to the 2.097 acre strip). It further confirms our conclusion that the damages claimed based on the costs to an industrial user crossing the highway were purely speculative. This sale for residential purposes has relieved us of the necessity for speculation. It has now been made clear that these costs will not be incurred and that they will not diminish the price paid for the property.
We therefore amend the judgment of the trial court by deducting therefrom the $30,000 awarded for damage to the tract east of the highway. In all other respects we affirm the decision of the trial court, with all costs permitted by law assessed against the plaintiff-appellant.
Amended and affirmed.