LANDRY, Judge.
Plaintiffs, widow and major children of Roy J. Landry, deputy sheriff, Terrebonne Parish, deceased, brought this action to recover damages for the death of decedent who died of injuries received in an in-tersectional collision while riding as guest passenger in an automobile being driven by decedent’s fellow officer, Lt. Calvin J. Ba-bin, Jr. The Dodge vehicle being driven by Babin on the superior street, was struck virtually broadside by a 1950 model Chevrolet being driven by defendant, Thomas Stadium, Jr., uninsured. Plaintiffs sued Stadium, Babin and Phoenix Insurance Company, as omnibus insurer of Babin under a policy covering the vehicle Babin was driving, which automobile belonged to the Sheriff’s Department, Terrebonne Parish. The trial court gave judgment for plaintiffs against Stadium alone, rejecting plaintiffs’ claims against Babin and Phoenix. Plaintiffs have appealed asking for: (1) Judgment against Babin and Phoenix, together with Stadium, in solido; (2) an increase in the awards to plaintiffs, and (3) judgment fixing expert witness fees *345 for a surveyor and surgeon who testified in the case. We affirm the judgment rejecting plaintiff’s claims against Babin and Phoenix; we affirm the awards made below; we reverse the judgment declining to award expert witness fees to the surgeon who testified; we affirm the judgment which refused to award expert witness fees to the surveyor.
The pivotal issue is whether decedent’s host driver exercised proper caution in negotiating an intersection when faced with a flashing yellow light.
Decedent was 54 years old at the time of his death. The accident occurred at approximately 12:27 A. M., September 7, 1968, while decedent was patrolling with his superior officer who was also a Deputy Sheriff.
The accident occurred in the business district of Houma at the intersection of Barrow Street, which runs northerly and southerly, and Bond Street which courses in an easterly-westerly direction. Barrow Street accommodates both northbound and southbound traffic. Bond Street is one way west. South of the intersection, Barrow Street has three lanes of travel. The easternmost lane is 12.9 feet in width, the center lane 13.3 feet wide and the westernmost lane 16.7 feet wide. North of the intersection, Barrow Street is the same width as it is south of the intersection, but accommodates only two lanes of travel. Division of northbound and southbound traffic into two lanes on Barrow north of the intersection is accomplished by a triangular shaped neutral ground formed by yellow lines painted on the Street surface. The base of the triangle commences in the center of Barrow Street a few feet north of the north line of Bond Street. The legs of the triangle extend northerly along Barrow Street, and meet at the apex approximately 70 to 80 feet north of the northerly line of Bond Street.
Bond Street, which is one way west, is three-laned both east and west of Barrow. The southern lane of Bond is 13.2 feet wide, the center lane 10.6 feet in width, and the northern lane 10.2 feet wide. The center line of the center lane of . Bond east of Barrow is 18.5 feet north of the south curb line of Bond. The intersection is controlled by multiple electrically operated traffic signals so arranged that one light faces each lane of travel on both Barrow and Bond Streets. During daylight hours the signals operate on the customary green, amber and red light sequence. At the time of the accident, each light was flashing a yellow or caution signal to traffic on Barrow and red or stop signal to motorists on Bond Street.
On the Southwest corner of the intersection, set well back from both Barrow and Bond Streets, is situated a Do Nut shop. The northwest corner is occupied by a Texaco Service Station, immediately to the north of which, also on the west side of Barrow Street, is located a Midas Muffler Shop. A mercury vapor street light is situated on the northwest corner of the intersection. This light is mounted on a pole which extends over the southbound lane of Barrow Street. The precise location of the light is 25.9 feet west of the centerline of the east lane of Barrow Street. The only other traffic light in the vicinity is another mercury vapor light situated on the north side of Bond Street a distance of 132.2 feet east of the center line of the east lane of Barrow Street. This light is mounted on a pole with an overhanging suspension arm extending 10.2 feet south of the north curb of Bond Street. At the northeast corner is situated an open parking lot to accommodate patrons of a shopping center set well back from the street. A supermarket occupies the southeast corner. The building is set back 29.9 feet and 32.5 feet from the property sides of the curbs of Bond and Barrow Streets, respectively. The corner of the building at intersection does not form a right angle. It is conceded that at the time of the accident, the shopping center parking lot was unlighted. It is also conceded that the exterior lights of the supermarket were off and that the only light emanating from the *346 establishment was through a narrow glass wall opening measuring about 18 inches wide near the top of the building. The service station was closed, but there is some uncertainty concerning whether or not a large outdoor sign on the premises near the corner was lighted at the time of the accident. There is likewise some uncertainty concerning whether or not the Do Nut shop was open and lighted at the time. In front of the supermarket building was located an ice cream sign and one or more newspaper vending machines, the ice cream sign being the tallest and measuring four and one-half feet in height.
The speed limit in the area was 35 miles per hour.
At the time of the accident, Babin was proceeding northerly in the eastern lane of Barrow Street and Stadium was traveling westerly in the center lane of Bond Street. The right front fender and door of the Ba-bin vehicle was struck by the entire front of the Stadium car. The impact occurred in the northeast quadrant of the intersection. The investigating officer found that the front of the Babin vehicle was 7 to 8 feet from the north curb of Bond Street at the instant of impact. Following the impact, the Babin car continued northwesterly a distance of 92 feet and came to rest against a sign standard situated about three feet west of the west curb of Barrow Street on the property line between the service station and the muffler shop. The Stadium car traveled a distance of 25 feet from the point of impact and came to rest north of the intersection in the southbound lane of travel of Barrow Street facing in an easterly direction. It is undisputed that the damage to the Dodge was $1,730.66 which rendered the vehicle a total loss.
A surveyor’s plat of the intersection discloses that at a point 70 feet south of the south curb of Bond Street, a driver traveling northerly in the east lane of Barrow Street could see easterly to the center lane of Bond Street a distance of 93 feet from the center of the east lane of Barrow Street or a distance of approximately 85 feet east of the east curb line of Barrow Street. The same plat shows that at a point 40 feet from the south curb line of Barrow a driver proceeding in the east lane of Barrow could see easterly to the center line of the center lane of Bond Street a distance of 237 feet from the center line of the east lane of Barrow Street or approximately 230 feet east of the east curb line of Barrow Street.
Following the accident, the right front door of the Dodge automobile had to be pried open to remove Landry from the vehicle. No skid marks were left by either vehicle indicating that neither driver applied his brakes prior to impact. A heavy aluminum clip board, used by the officers for making reports, was on the seat of the car between the deputies. The force of the impact wedged the board between the men, bending and warping it out of shape. Neither Babin nor Landry were thrown from the Dodge car. Stadium was thrown from his vehicle and found lying in the street after the collision.
The trial court found the speed of the Stadium vehicle to be “considerable”, which we take to mean excessive and unreasonable. While there is some dispute concerning whether the lights on the Stadium car were burning at the time, the lower court made no definitive finding on this issue. The lower court theorized that Stadium could have come out of the parking lot, or that he could have been traveling without headlights, or that he could have gone through the intersection without stopping, or that he stopped and then drove through the intersection at high speed. Relying on Pecunia v. Gaudet, La.App., 217 So.2d 511, the trial court found it unnecessary to decide whether Stadium did in fact stop. The court concluded that if Stadium did not stop, Babin’s failure to see Stadium was not a proximate cause of the accident. The court also found that if Stadium did stop, Babin’s failure to see him was of no *347 importance because, had Babin seen the stopped car, Babin could reasonably have concluded the other vehicle would remain stopped and respect his right of way.
Appellants maintain the trial court erred in failing to find that Babin did not exercise caution in entering the intersection as required by the pertinent statute. In substance, appellants urge that Babin entered the crossing without maintaining a proper lookout for motorists approaching on Bond Street. It is argued that since Babin could see easterly on Bond Street a distance of 85 feet when he was 70 feet from the corner and 230 feet when he was 40 feet from the corner, he either did not look, or looked and failed to see the Stadium vehicle traveling in the center of Bond Street. Appellants also urge that the presence of the signs in front of the supermarket created an obstruction of view imposing upon Babin the burden of keeping a sharp lookout for westbound vehicles on Bond Street, which duty Babin failed to discharge by not making sure there were no approaching vehicles before entering the intersection.
Babin testified that he approached the intersection traveling at a speed of 20 to 25 miles per hour in the east lane of Barrow Street. He and Landry had stopped at a service station about two blocks south of the scene of the accident and purchased gasoline. He slowed down for the intersection, and when approximately two car lengths from the corner (about 40 feet), he looked to his right along Bond Street and saw no approaching traffic. As he reached the intersection, he glanced up at the light and “when his eyes came down”, he saw the approaching car to his right about five feet away. He stated that, at the moment of impact, the part of his car that was struck was past the cen-terline of Bond Street, and the front end of his vehicle was only about four or five feet from the north curb line of Bond Street. In a prior deposition, hfe did not mention having looked to his right before entering the intersection. He explained his prior failure to mention looking before entering the crossing by stating that his prior interrogation addressed itself only to his actions upon entering the intersection. He conceded that when looking up Bond Street before entering the crossing, his view was impeded to some extent by the signs in front of the supermarket, but that he could see at least the top of a vehicle 40 to 50 feet away from the corner on Bond Street. Babin stated that neither he nor Landry were thrown from the vehicle by the impact. He maintained the Stadium car was unlighted because if its lights were burning, he would have seen it. He acknowledged that he did not see Stadium’s car until it was five or six feet away, and it was then too late to take any evasive action. Babin denied having admitted to plaintiff, Earl Landry, at decedent’s wake, that he, Babin, was responsible for the accident because he was looking at the Do Nut shop just before entering the intersection.
Lieutenant Robert Bergeron of the Hou-ma Police Department investigated the accident. He considered the lighting of the intersection “average” for a city area. From debris observed on the street, he fixed the point of impact in the northeast quadrant of the intersection north of the center line of Bond Street. He explained that, at the moment of impact, the Babin car was in the east lane of Barrow and the Stadium car in the center lane of Bond Street. He estimated the front end of the Babin car was about 6 feet south of the north curb of Bond Street when the impact occurred. Bergeron stated that Babin reported having slowed down for the light, saw nothing coming down Bond Street, proceeded into the intersection at a speed of about 20 miles per hour, saw the Stadium car coming at a high rate of speed, but could do nothing to avoid the accident. He also stated that Babin reported that the vending machines and signs in front of the supermarket impeded his view. Bergeron found no skid marks left by either vehicle. *348 Upon arriving at the scene, he noted the lights were not burning on the one remaining headlight on the Stadium car. He did not check to see if the light switch of the vehicle was off or on, but did check the ignition which was turned off. He made no notation as to the absence of lights on the Stadium car, and acknowledged that if such a circumstance had been brought to his attention, he would have entered it on his report. He examined Stadium whom he found lying in the street. He found that Stadium’s breath smelled of alcohol, but that since Stadium was unconscious, he could not determine if Stadium were intoxicated. Approximately one week before the accident, Bergeron assisted counsel for appellees in conducting certain experiments to determine the distance at which a lighted and unlighted vehicle could be detected by a driver on Barrow Street. He noted that from a car parked in the east lane of Barrow Street 30 feet from the intersection, a driver not particularly looking for the approach of an unlighted car, could not see an unlighted vehicle traveling in the center lane of Bond Street until such a vehicle was approximately one and one-half car lengths from the intersection. From the same position, a driver keeping a lookout for an approaching unlighted car could see an unlighted vehicle approaching at a maximum distance of 76 feet. Bergeron noted that from this same position, he could see the top of an approaching vehicle above the tops of the sign and vending machines in front of the supermarket.
In substance, plaintiff, Earl Landry, and other plaintiffs testified that at decedent’s wake, Babin admitted the accident was his fault because he was looking to his left at the Do Nut Shop just before entering the intersection.
LSA-R.S. 32:234(A) (2) provides that a motorist may proceed through or past a flashing yellow signal “only with caution.” Relying on Kirkland v. Martin, La.App., 220 So.2d 773, appellants urge that prior to enactment of the statute, our jurisprudence was, in effect, that to violate the statute, a motorist had to be guilty of gross negligence. It is contended that before the advent of the law in question, a motorist facing a yellow flashing signal was in substantially the same position as one confronted with a favorable green go signal. Appellants argue, however, that the statute changed the rule and imposed a greater burden of care. Kirkland, above, cites two cases which, according to appellants, establish that a lesser standard of care existed before the statute was enacted. We do not so view these authorities. In Marbury v. Arnold, La.App., 142 So.2d 507, a driver proceeding through a flashing yellow light was held not negligent in proceeding into an intersection at a speed reduced from 50 to 35 miles per hour, after looking both ways, and was struck by an automobile proceeding at 55 to 60 miles per hour. Due caution was held to have been exercised. In Savoy v. Cooley, La.App., 144 So.2d 223, the driver facing a flashing yellow signal was held negligent in speeding up to enter an intersection ahead of an oncoming car when she had opportunity to avoid the accident and failed to do so. We hold that the effect of the statute is, as said in Jolley v. Continental Southern Lines, Inc., La.App., 170 So.2d 114, merely a codification of prior jurisprudence which held that a flashing red light means “stop” and a flashing yellow signal requires that a motorist proceed only with caution.
It is axiomatic that the issue to be resolved, being factual in nature, must be resolved in the light of the circumstances of each individual case.
Appellants cite three cases in support of their contention that Babin did not meet the standard of care required. In Trouth v. Allstate Insurance Company, La.App., 221 So.2d 555, the driver proceeding through a yellow flashing light was held contributorily negligent upon the finding that he did not slow down for the intersection, ancL-failed to take even the elementary precaution of looking at all. In Drago *349 v. State Farm Mutual Automobile Insurance Company, La.App., 236 So.2d 570, the driver facing a flashing yellow signal was held contributorily negligent because, after noting the approach of the other vehicle, he did not reduce his speed but rather speeded up when he realized the other motorist would not stop. Neal v. Weaver, La.App., 220 So.2d 751, held that a driver approaching on a flashing yellow light was contributorily negligent in failing to maintain any lookout at all.
We find .that the evidence preponderates in favor of the conclusion that the sole proximate cause of the accident was the patently excessive speed of the Stadium vehicle which entered the intersection without stopping or slowing down. The physical facts consisting of the damage to the two vehicles, the damage to the clipboard, and the ejection of Stadium from his automobile stand as mute evidence of Stadium’s excessive speed. It is inconceivable that Stadium could have either exited the shopping center parking lot or have stopped at the intersection and accelerated to the speed at which he was traveling at the moment of impact.
We are of the further view that it is immaterial in this instance whether the lights were burning on the Stadium vehicle or not. If the lights were not burning, then most certainly Babin could not be deemed negligent for having failed to see such a fast moving, unlighted vehicle under the circumstances. If the headlights of the Stadium car were burning, we find that when Babin looked before entering the intersection, the Stadium vehicle was a considerable distance away on Bond Street, perhaps beyond Babin’s vision. Assuming the Stadium vehicle was in sight when Ba-bin looked to his right while 40 feet from the intersection, we fail to see wherein Ba-bin was negligent. After looking Babin traveled approximately 60 feet to the point of impact. If Stadium was proceeding at only 40 miles per hour, Stadium would have been at least 120 feet from the point of impact when Babin looked. Had Babin seen Stadium approaching under these circumstances Babin would have been entitled to assume that Stadium was traveling at a lawful rate of speed and would respect Ba-bin’s right of way. We find it would have been reasonable for Babin to conclude he could proceed in safety. We find, therefore, that Babin’s failure to see the approaching vehicle until the instant before impact was not negligence on his part.
LSA-R.S. 13:3666A provides that a witness called to testify to an opinion founded on special study or experience in any branch of science, or make scientific or professional examinations, and state the results thereof, shall receive additional compensation as an expert witness. Whether or not the witness appears as an expert depends on the nature of the testimony given. If he gives professional opinion, predicated upon tests, studies or examinations, he is entitled to an expert witness fee and compensation for time spent in preparation for trial. If he expresses no opinion and merely gives testimony regarding facts or circumstances which could be attested by a lay witness, the witness is not entitled to the fee of an expert.
In this instance, we find that Harold J. Terracina did not give any expert testimony. Mr. Terracina, a surveyor, merely prepared a platted layout of the intersection showing street and lane widths, locations of light poles, location of overhanging traffic signals, the locations of buildings at the corners and sight distances. Such information could have been provided by any knowledgeable layman. We find that the information, while helpful to the court, does not qualify as expert opinion testimony as required by the pertinent statute. We find such services within the ambit of Griffin v. Yellow Cab, La. App., 61 So.2d 225.
We find the services of Mr. Terracina differ from those rendered by a surveyor *350 in Joseph v. Netherton Company, La.App., 136 So.2d 556, relied on by appellants. In the cited case, the surveyor computed yardage of dirt excavated, the elevation of a lot as related to street, and testified as to the usefulness of the elevation. The court therein concluded the witness was entitled to the fee of an expert. Wappler v. Braucht, La.App., 209 So.2d 603, is also distinguishable from the case at hand. In the cited case, a surveyor and engineer was awarded witness fees as an expert because he gave professional opinion regarding the nature and size of a drain required to drain plaintiffs land which had been blocked by defendant.
We find, however, that the witness fee of Dr. Karl G. Haydel, Surgeon, who treated decedent following the accident, should be fixed at that of an expert witness. It is to be noted that plaintiffs seek damages for the pain and suffering endured by decedent from the time of the accident until decedent’s demise. To substantiate this item of damages, Dr. Haydel testified to the nature and extent of decedent’s injuries and whether or not decedent regained consciousness following the accident. It is clear that in so testifying, Dr. Haydel gave professional, expert opinion. We fix Dr. Haydel’s fee at the sum of $100.00.
Considering our exoneration of Babin, any increase in the awards to plaintiffs would be a vain and useless thing. The evidence shows that Stadium, the only other party against whom plaintiffs may recover, is impecunious. Any further judgment against him would serve no purpose.
The judgment of the trial court is reversed insofar as it declined to award Dr. Karl G. Haydel fees due an expert witness, and judgment rendered herein fixing the fee of Dr. Haydel, expert, in the sum of $100.00; and taxing same as costs; in all other respects, the judgment of the trial court is affirmed, at appellant’s cost.
Amended and rendered.