316 So.2d 749 (1975)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
PORT PROPERTIES, INC. (two cases).
Nos. 9760, 9761.
Court of Appeal of Louisiana, First Circuit.
June 30, 1975.
Rehearing Denied August 26, 1975.
*751 John C. Christian, J. B. Miller and J. Brooks Greer, III, New Orleans, Joseph W. Cole, Jr., Port Allen, for appellant.
Johnie E. Branch, Jr., D. Ross Bannister, Charles E. Pilcher, William W. Irvin, Jr., Alva J. Jones and Jerry F. Davis, Baton Rouge, for the Highway Dept.
Before LOTTINGER, BLANCHE and DE LA HOUSSAYE, JJ.
BLANCHE, Judge.
These consolidated expropriation cases concern a 943-acre tract located in West Baton Rouge Parish, Louisiana, from which two parcels were taken under the provisions of LSA-R.S. 48:441, et seq., usually referred to as the "quick taking" statute.
The areas expropriated were taken for the roadway and sections of the bridge approaches for that part of Interstate Highway 10 which lies immediately west of the Mississippi River. The effect of the roadway taking was to almost evenly divide the tract in question.
More particularly, on April 9, 1964, the Department of Highways filed its petition in Suit Number 9760 (referred to herein as the "bridge approach" suit) in which it took 10.792 acres from the easternmost part of the tract for certain of the bridge approaches necessary in that vicinity. On July 15, 1968, the condemnor filed Suit Number 9761 in which 101.69 acres and 1.49 acres were taken for the highway and a servitude of drainage, respectively. In the first suit, $17,270 was deposited as just compensation for the condemnee, and in the second, the sum of $238,657 was likewise deposited, both of which were withdrawn by Port Properties, Inc., after deposit. Thereafter, the property owners sought increases through litigation and the cases were duly consolidated and tried. As a result thereof the District Court, in lengthy and detailed written reasons for judgment, awarded $27,681.48 for the "bridge approach" acreage and $309,540 for the second taking. Additionally, the Department of Highways was cast for $70,238.60 for drainage culverts installed by the landowner, $1,100 for a model prepared by the defendant for the trial, and for some $19,000 in expert witness fees, plus interest and other costs. The landowners' claims for severance damages were denied.
Jacintoport Corporation, the successor of Port Properties, Inc., has appealed that judgment and the Department of Highways has answered that appeal. We find that the judgment of the District Court should be amended in certain respects and affirmed.
Port Properties, Inc., acquired this undeveloped agricultural and timber property on October 15, 1956, for a price of $1,190,700, or slightly over $1,050 per acre. On March 4, 1959, a public hearing was held in Baton Rouge, Louisiana, in which the route of Interstate Highway 10 was explained, including the location of a new bridge across the Mississippi River as part of that highway. The route proposed was directly through the defendant's property and was only slightly changed thereafter, and that at the request of the owners of the tract. On August 1, 1969, Port Properties, Inc., conveyed the property to the present owner, Jacintoport Corporation, along with other assets, including their rights in these and other lawsuits concerning this property.
At the time of the filing of the "bridge approach" suit, the land in question was bounded on the east by the Texas & Pacific Railroad track and right of way; slightly further to the east, Louisiana Highway *752 1 parallels those tracks. To the north, this property adjoined Westside Village Subdivision and, in part, was bounded by Louisiana Highway 76. The southern boundary was the intercoastal waterway and other landowners, and on the west were adjacent landowners.

THE "BRIDGE APPROACH" SUIT
Expropriated in this first taking was an irregularly shaped strip running north and south which paralleled the railroad right of way and Louisiana Highway 1 and which flared and widened to the west on the southern end of the strip.
At the time of that taking, LSA-R.S. 48:453, since amended, provided as follows:
"§ 453. Measure of compensation; burden of proof
"The market value is determined as in general expropriation suits but as of the time the estimated compensation was deposited in the registry of the court.
"Damage to the remainder of the property is determined as of the date of the trial.
"In either case the defendant has the burden of proving his claim. * * *"
In applying this statute, the trial judge found that the defendant should be awarded $2,565 per acre for the "bridge approach" acreage. That figure was reached by valuing the land at $2,850 per acre as of April 9, 1964, and deducting 10 percent from that amount as the increment by which the value of the land had appreciated due to the project itself.
In so doing, he found the highest and best use to be that of light industrial and residential. In reaching the aforementioned valuation, the court accepted an amount somewhat greater than that assigned by the appraisers for the plaintiff, Messrs. John B. Pugh, Karl J. Snyder and Max J. Derbes, Jr., who placed value at $1,800 to $2,000 per acre, but far below that reached by Messrs. Heidel Brown and Verdie Reece Perkins, who valued that particular acreage for the defendants at $7,000 to $7,500 per acre. The great disparity in the values assigned by the various appraisers is due to the fact that the defendants' experts placed a premium on that particular acreage taken here under the "front land-rear land" concept, which recognizes that different classes of land may exist within a tract and that, where a front portion may be of much greater value than the remainder of the tract to the rear, the frontage must be awarded the greater value rather than the average per acre value of the whole tract. State, through Department of Highways v. Hoyt, La., 284 So.2d 763 (1973).
Jacintoport's appraisers reasoned that this particular parcel, being on the southeast corner of this property and thus closer to Louisiana Highway 1, the port, and the railroad, possessed a greater value than other parts of the property.
In Hoyt, supra, the Supreme Court of this state recently approved this appraisal technique in these terms:
"The landowner is thus to be awarded the actual market value of the particular portion of the property taken, valued according to its highest and best use. He is not limited to its average per-acre value as a pro rata portion of the parent tract where the front portion has a different and higher best-use value.
(Citations of authority omitted)
"As the cited decisions show, where the evidence shows that the front portion of the tract taken has a higher value than the rear portion not taken, the landowner must be awarded the higher value for the land actually taken rather than an average value based on its proportinate portion of the land-area of the parent tract."
The trial judge rejected the use of that concept here. We think, however, that the *753 particular acreage taken in the "bridge approach" suit was of a different class and of greater value than most of the remainder and that the front land-rear land doctrine should have been applied here for valuation purposes. Not only did the defendants' appraisers so testify, but also we note that one of the Department of Highways' appraisers, Mr. Derbes, also found that this acreage was of more value than the remainder.
The testimony of Mr. Perkins is persuasive that the particular 10.792-acre tract in question was worth $7,500 per acre as of the date of taking. That appraiser further testified, however, that in his opinion the only increase in value experienced by the property as a result of the announcement of the project was a 5 percent general benefit to all the land in the area, which should not be deducted from the value awarded. We conclude, as did the trial judge, that Jacintoport's tract had specifically benefited 10 percent as a result of this project at the time of the taking. We, therefore, find that under the authority of certain jurisprudence to be discussed at a point later in this opinion, 10 percent must be deducted from the $7,500 per acre figure; and we, therefore, determine that the defendant is to be paid $6,750 per acre for the "bridge approach" tract, or a total of $73,710.
We further conclude that for reasons discussed at a point further in this opinion, no severance damages are due to the remainder for the taking in the "bridge approach" suit. We note in passing, however, as did the trial judge, that this particular taking did not substantially affect the access of this tract to Louisiana Highway 1, which still is, as it always has been, by the use of Avenue G, which is located at the northeast corner of the acreage.
THE INTERSTATE HIGHWAY SUIT
In regard to the decision rendered in the suit involving the second taking, the appellant has specified numerous issues for reversal by this Court. They are, basically, allegations that the trial court did not value sufficiently the 103.18 acres taken for the roadway and that it denied severance damages to the remainder. That court found that this acreage should be valued at $3,000 per acre at the time of the taking on July 15, 1968. Again, this figure was reached by determining value to be $4,000 per acre on the date previously mentioned and deducting therefrom 25 percent as the increment by which the value of the land had appreciated due to the project itself. On the date of the taking, the highest and best use was determined by the court to be commercial, light industrial and residential.
Again, the court placed value at a figure somewhat between the appraisers for the parties. The Department of Highways' experts, Messrs. Snyder, Pugh, and Derbes, found the value of this particular acreage to be $2,000, $2,250, and $2,086, respectively, while Messrs. Perkins and Brown for the defense found value to be $5,000 and $4,600 per acre, respectively. As might be expected, many sales in West Baton Rouge and surrounding parishes have been cited as comparable by these highly qualified and experienced appraisers as guidance for the court in determining the amount to be awarded. An overview of these reflect transactions ranging from $400 per acre to $102,000 per acre, but generally being in the $2,000 to $5,000 per acre category, depending on location, time, and other factors.
The findings of the trial judge will not be overturned unless manifest error appears in the record. State, Department of Highways v. McPherson, 261 La. 116, 259 So.2d 33 (1972). As noted in McPherson:
"Expert opinions are not ordinarily conclusive. They are generally regarded as advisory in character. Unlike testimony to a fact, an opinion seeks only to assist the court in its effort to determine *754 the ultimate fact. Thus opinions as to value are not binding on the trier of fact. Peiser v. Grand Isle, 224 La. 299, 69 So.2d 51 (1953); Housing Authority of New Orleans v. Gondolfo, 208 La. 1065, 24 So.2d 78 (1945); La. Power & Light Co. v. Dixon, 201 So.2d 346 (La.App.1967); State v. Wagner, 233 Minn. 241, 46 N.W.2d 676 (1951); 31 Am.Jur.2d, Expert and Opinion Evidence, § 183.

* * * * * *
"Instead, the effect to be given to opinion testimony is governed by the weight the trier of fact accords to that testimony. The weight testimony is entitled to receive is determined by the professional qualifications and experience of the expert, the facts and studies upon which his opinion is based and, in case of land appraisals, his familiarity with the locality. La. Power and Light Co. v. Dixon, 201 So.2d 346 (La.App.1967). In all cases the possible bias of the witness in favor of the side for whom he testifies and the witness' character and credibility bear upon the weight of the testimony."
As specifically mentioned in his written reasons for judgment, the trier of fact, in reaching a conclusion as to value, weighed several factors including the highest and best use of the remainder, the size and topography of the tract, the sales potentials in the near future for the remainder, certain unspecified comparable sales, and the testimony of the appraisers which was contradictory in many respects.
Rather than accepting a specific comparable sale or the testimony of any particular appraiser, the court, after considering all of the above, placed value, as previously mentioned, at an amount between those suggested by the experts. This is within the prerogative of that court and there is ample evidence in the record to support the conclusion reached. State, Dept. of Highways v. Beaird-Poulan, Inc., 292 So.2d 842 (La.App. 2nd Cir. 1974). Accordingly, we find no error in the award made for the Interstate Highway taking.
The appellant specifies as error the fact that the trial judge determined acreage values as of the time of the taking and then subtracted 25 percent therefrom as the value added to the property by the announcement of the project. They cite as authority for their contention that this procedure was erroneous the case of State, Department of Highways v. Vermilion Development Co., 258 La. 1159, 249 So.2d 167 (1971), cert. den. Louisiana v. Patout, 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 253.
In State, Department of Highways v. Trippeer Realty Corp., La., 276 So.2d 315 (1973), a case initiated under the "quick taking" statute, our Supreme Court made the following observations at page 319:
"As was stated in State, through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 (1963) the value of the property should be fixed considering the property as of the time it is taken, but not as enhanced by the purpose for which it is taken."
And, on page 320 of that case, the Court again reaffirms the Hayward decision and reiterates other principles which are appropriate to the case at bar:
"Just compensation for property taken is the fair market value thereof immediately prior to the taking without any enhancement by virtue of the purpose of the taking. State, through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 (1963); Gulf States Util. Co. v. Wyatt, 164 So.2d 615 (La.App. 3rd Cir. 1964); State v. Chadick, 226 La. 367, 76 So.2d 398 (1954). Where a tract of land is partially taken, damage to the remainder is considered as severance damages, and these damages are given in addition to the award for the land actually taken. State Through Dept. of Highways v. Reddell Creosote Co., 252 So.2d 721 (La.App. 3rd Cir. 1971); State Through Dept. of Highways v. Wolfe, *755 252 So.2d 483 (La.App. 3rd 1971). The burden of proving these severance damages is on the landowner. State Through Dept. of Highways v. William T. Burton Industries, Inc., 219 So.2d 837 (La.App. 3rd Cir. 1969). Under the "Quick Taking Statute" (La.R.S. 48:441-60) severance damages are determined as of the date of trial. La.R.S. 48:453, State Through Dept. of Highways v. Browne, 224 So.2d 51 (La.App. 1st Cir. 1969).
"The expropriating authority is allowed to offset against severance damages any special benefits accruing to the remainder of the property. However, the authority has the burden of proving these special benefits. State, through Dept. of Highways v. Central Realty Co., 238 La. 965, 117 So.2d 261 (1960); Thomas & Warner v. City of New Orleans, 230 La. 1024, 89 So.2d 885 (1956).
"Special benefits are those which arise from the peculiar relationship of the land in question to the public improvement, which will result from the taking. La. Highway Commission v. Grey, 197 La. 942, 2 So.2d 654 (1941). Special benefits are to be distinguished from general benefits (for which there is no set-off against severance damages). A general benefit is one which arises merely from the fulfillment of the public object which justified the taking; there is no particular relationship between the remaining property and the public improvement. State, through Dept. of Highways v. Marks, 188 So.2d 653 (La.App. 4th Cir. 1966), Louisiana Highway Commission v. Grey, supra."
In the Vermilion Development case, the Court was concerned with the value to be assigned several houses in a subdivision which were expropriated, sold by the State, and moved to other locations after the taking. The language relied upon by the defendant is the following:
"Consequently, the measure of compensation for the taking of the houses is their market value at the time of taking and not the `salvage value' as found by the Court of Appeal."
The settled rule of law is, as stated in Trippeer, that the landowner should receive market value less any increase in value that might be attributed to the project for which the taking is made. We think the Vermilion Development case is not in conflict with Trippeer, but is distinguishable. In Vermilion, the Court was making no change in the law but was dealing with a specific situation involving houses which were required to be moved and which obviously would not appreciate in value because of the project for which they were taken. The Court had no need to reach any question of project enhancement there as, obviously, no appreciation in value could accrue to houses which had to be moved from the scene to make way for the project and was there simply stating that the proper value to be assigned for the houses taken was their market value at the time of the taking.
The District Judge concluded that the acreage expropriated in the 1968 taking had appreciated 25 percent in value as a result of the 1959 announcement of the project. As our review of the severance damage issue at a further point herein will reflect, we find that judgment to be correct and his deduction of that amount to be proper.
An argument advanced by the landowners and closely related to the question of value just discussed is their contention that they should be paid July 15, 1968, value for the acreage taken on that date, without discount for the enhancement value caused by the project because the 1968 taking was, in fact, a separate and distinct project which did not fall within the scope of the project announced on March 4, 1959. We think that argument to be without merit, as did the trial judge. The evidence is overwhelming that the project explained on the date indicated above at a hearing in Baton Rouge, Louisiana, called a "hearing *756 on Federal Interstate Highway urban plan for the Parishes of East and West Baton Rouge" encompassed the new Mississippi River bridge and at least five miles of highway to the west. We quote the following which is, in part, the report presented at that hearing:
Page 1. " the proposed Interstate Highway in East and West Baton Rouge Parishes. This hearing is concerned with the routing of the Interstate Highway. The entire route of the Interstate segments in the two parishes will be shown and explained to you in detail, and you will be given an insight into the methods and reasons for selecting the recommended routes. we are going to first give you a graphic view of our studies which led up to the recommended Interstate Route through East and West Baton Rouge Parishes."
Page 10. " the route to the west of Port Allen crosses the Mississippi River in the vicinity of South Boulevard."
Page 12. "Beginning at a point approximately five miles west of Port Allen and continuing on a direct line to the east using a 300 foot right of way, we traverse an area that is generally undeveloped. This is the start of the junction of the two Interstate Routes." (proposed Routes I-10 and I-410)
"This is Interstate Route 10 and will continue through Port Allen and across the Mississippi River Bridge. Continuing on a straight line again skirting the edge of the cultivated area and continuing east into Port Allen,east again through land that has not been developed, to a point where we are just west of Port Allen. At this point State Route 76 or the extension of Court Street is just to the top of the picture we have here. We have a partial connection which will give us access to and from the west into Port Allen. The route continuing through to cross State Route 1 and here is the continuation of that route crossing the new bridge the new four-lane bridge which is being built on State Route 1 is just to the south of this interchange. The port property is just to the right as we are looking at it and here we have an interchange with State Route 1, which also crosses the railroad tracks which parallels Interstate Route 10. Continuing across the port authority and you can see the port there we are just north of the developed port and extending through to a point just south of South Boulevard with a new bridge."
The law applicable to such a situation was stated in State, through Department of Highways v. Martin, 196 So.2d 63 (La. App. 3rd Cir. 1967), as follows:
"`If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.
"`The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising *757 from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.'" [196 So.2d 63, 67]
See also, State, Department of Highways v. Boles, 240 So.2d 786 (La.App. 2nd Cir. 1970).
All of the highway and drainage acreage taken was plainly within the scope of the originally announced project and, as such, must be valued as of the time of the taking, less any enhancement in value caused by the project.
The appellants strenously urge upon us their contention that severance damages are due the remainder as a result of both takings involved in these consolidated cases. The effect of the taking for the roadway itself was to divide almost in half the tract owned by Jacintoport. In so doing, the southern half of the property was cut off from rail on the north and the northern part of the property was denied access to the intercoastal canal on the south.
The law concerning such damages has been previously cited herein and it is firmly established that, among other things, any severance damages which may be proven as of the time of the trial are to be offset by special benefits to the property. We conclude, as did the trial judge, trial judge, that any severance damages occasioned by the takings here are far outweighed by the special benefits accruing to this property.
The testimony of the Highway Department experts is persuasive that the location of the road greatly increased the value of the remainder. A basically agricultural and timber tract with no access to deep water became a prime light industrial area as a result thereof. Highway interchanges created highly valuable commercial property out of backwoods.
An excellent indication of this is the sale from R. J. Hummel, Jr., to Jacintopo Corporation on September 12, 1969, of an 80-acre tract located immediately south of Interstate Highway 10 and adjoining the appellants on the east. The price was $606,075 or $7,500 per acre and, as the appellant's appraiser, Mr. Perkins, testified at page 268 of the transcript:
"As to the Hummel sale, I think the property sold for the market value. . . Yet I feel they didn't pay more than the market value of the land. . ."
Also to be considered is the sale on August 1, 1969, of all of the assets, except cash, of Port Properties, Inc., to Jacintoport Corporation, the appellant herein, including the entire tract at issue here in addition to the vendor's rights in these and two other lawsuits. The recited consideration was $4,750,000 of which $3,120,000 was specifically assigned as value to the four lawsuits. The District Court examined this transaction at length in an effort to determine the actual value of the property, as such would be a prime indication of whether severance damages had been offset by special benefits. On page 12 of its written reasons for judgment, the court observed:
"* * * The Court is of the definite opinion that the prime reason, if not the exclusive reason, for using the stated evaluations of the suits was to prevent the Court from using the sale as a comparable to show the after value of the remainder of the property in the hope that judgment for a greater sum would be rendered on behalf of the property owner."
The court further reasoned that if all of the awards made by it in these two suits were subtracted from the $4,750,000 paid for the 869.23 remaining acres, the land possessed a value of $5,274.17 per acre as of the August 1, 1969, sale date; additionally, the court further concluded that immediately after the last taking on July 15, 1968, a value of $5,125 per acre would be indicated, all of which compels the conclusion that the property was more valuable *758 after the taking than before. We concur, and believe that the evidence clearly preponderates that this project greatly increased the value of defendant's property. It should also be noted that the other two suits which Jacintoport acquired were either dismissed or settled for an insignificant amount of money.
The appellee's answer to this appeal seeks the deletion of three awards made in favor of the landowner by the District Court. There, judgment was rendered for Jacintoport in the amount of $70,238.60 for the installation of three drainage culverts allegedly necessary due to the inadequacy of those installed by the Department of Highways when Interstate Highway 10 was built. The Department argues, without citation of authority, that if additional expenses for these culverts were actually required, that those expenses should be treated as an item of severance damages and, as such, be offset by special benefits.
We conclude that the defendant has established by a preponderance of the evidence that their additions were necessary and that the drainage system constructed by the plaintiff was at least improperly installed, if not inadequate. At pages 878 and 879 of the transcript, the Department's own expert, Mr. Allen L. Cox, so indicated in these terms:
"Question, `If you were doing it today would you recommend that those structures that we have talked about be placed lower?' Answer, `Definitely so.'
Have you had any reason to change your opinion since January 31st as you expressed it there?
A. No."
This conclusion was supported by the testimony of Jacintoport's engineer, Mr. John A. Graves; accordingly, the trial court's award in that respect will be affirmed.
We also sustain that court's award of $14,000 for the loss to the landowner of 700 feet of spur track removed for the construction of the highway. Although built in 1966, well after the announcement of the highway route, the record indicates that the trackage was built in good faith by the landowner in an effort to satisfy a prospective lessor who had purchased an option from them. Efforts were thereafter made by Mr. William Warren Munsen on behalf of the landowner to preserve the spur by persuading the Department of Highways to build an overpass over these tracks, but those efforts were unsuccessful. We think that the Department of Highways has failed in its burden to establish that the landowner acted in anticipation of the project in the construction of this railroad spur and the judgment of the court below in that respect will be affirmed.
The Department further contends that under the provisions of LSA-R.S. 13:3666, the trial judge erred in awarding $1,100 for the preparation by Mr. C. D. Diboll of a scale model of the property and for allowing an expert witness fee for Mr. Diboll's testimony in connection therewith. We find that the position of the Department of Highways on this question is correct. Where the witness gives no opinion testimony but presents only that which could be provided by a knowledgeable layman, no expert fee or award for work product should be allowed. Landry v. Stadium, 256 So.2d 343 (La.App. 1st Cir. 1971); Skains v. Allstate Insurance Company, 264 So.2d 230 (La.App. 1st Cir. 1972). That award will, therefore, be deleted.
The expert witness fees awarded below for Jacintoport's appraisers, Verdie Reece Perkins and Heidel Brown, and for their engineer, John A. Graves, will not be disturbed, as the record fully supports their extensive trial preparation. State, Department of Highways v. William T. Burton Industries, Inc., 219 So.2d 837 (3rd Cir. 1969).
*759 The judgment of the District Court will, therefore, be amended and affirmed in accordance with these written reasons. The appellee is cast for all costs of these proceedings as may legally be assessed against the State of Louisiana.
Amended and as amended, affirmed.