**UNITED STATES of America, Plaintiff-Appellee,**

v.

**2,353.28 ACRES OF LAND, MORE OR LESS, Situate IN the COUNTIES OF BREVARD AND VOLUSIA, STATE OF FLORIDA, and Lucille M. Bair, et al., Defendants-Appellants.**

**No. 26578.**

United States Court of Appeals
Fifth Circuit.

July 21, 1969.

Rehearing Denied Aug. 27, 1969.

---

Robert P. Smith, Jr., Chester Bedell, Nathan Bedell, Jacksonville, Fla., for appellants, Bedell, Bedell, Dittmar & Smith, Jacksonville, Fla., of counsel.

Edward F. Boardman, U.S. Atty., Tampa, Fla., Edmund B. Clark, Atty., U.S. Dept. of Justice, Clyde O. Martz, Roger P. Marquis, Asst. Attys. Gen., Washington, D.C., Francis G. Rearick, Trial Atty., Lands Division, U.S. Dept. of Justice, Orlando, Fla., Anthony C. Liotta, Philip M. Zeidner, Edmund B. Clark, Attys., Dept. of Justice, Washington, D.C., for appellee.

Before TUTTLE and GEWIN, Circuit Judges, and COMISKEY, District Judge.

GEWIN, Circuit Judge:

Trailblazing to the moon has made it necessary for the United States, exercising its power of eminent domain, to acquire large tracts of land here on earth. One such acquisition included 654.43 acres owned by appellant Colton, who received as just compensation for the taking an award fixed by a jury in the United States District Court for the Middle District of Florida.[1] The principal issue on this appeal is whether the district court erred, as the appellant contends, in disallowing evidence of enhancement in the land's value caused by

the original establishment of a space facility to which the appellant's land was later added. We hold that this evidentiary exclusion by the district court was improper and that the judgment must be reversed.

The record before us provides an interesting account of early developments in our nation's manned lunar landing program, accelerated in May 1961 when President Kennedy called upon Congress and the country to send an American to the moon and back before the end of the decade.[2] The President's challenge was accepted and, as this opinion goes to the printer, two American astronauts prepare to depart from the moon after successfully landing there and exploring the lunar surface. An initial step in the implementation of this national goal was the selection of a launch site. Officials of the National Aeronautics and Space Administration, after considering various locations, selected Cape Canaveral, Florida, now Cape Kennedy.[3] On August 24, 1961, the Justice Department, acting upon a request by NASA Administrator James Webb, filed in the district court a complaint in condemnation describing a 72,644-acre tract of land needed for the project.[4] The condemned tract did not include the Colton proper-

ty. A map attached to the complaint showed the northern boundary of the condemned tract to be just south of Haulover Canal. The appellant's land lay north of the canal and five and one-half miles beyond the northern boundary of the condemned tract. See Appendix A for a sketch of the area.

On December 24, 1963, over two years after the filing of this original complaint, the Justice Department, again acting pursuant to a request from NASA officials, filed a second complaint which called for the condemnation of an additional 14,800 acres, adjoining at the north the 72,644 acres already condemned. The Colton land was included in the new condemnation.

■ The fifth amendment to the Constitution provides that private property shall not be taken for public use without payment of just compensation to the owner. Market value is the judicial standard employed to measure just compensation, but in determining market value, courts must exclude any increment of value arising by virtue of the fact that the Government proposes to take the land for a public project.[5] In anticipation of a proposed project, real property adjacent to or near the land to

1. The jury award of $364,000 was $36,000 less than the amount which the Government had deposited with the district court as estimated just compensation. The deposit having been withdrawn by the appellant, a deficiency judgment of $36,000 was entered against him.

2. Speaking before a joint session of the Eighty-Seventh Congress, President Kennedy stated:

> We go into space because whatever mankind must undertake, free men must fully share.
>
> \* \* \* \* \*
>
> I believe that this Nation should commit itself to achieving the goal, before this decade is out, of landing a man on the moon and returning him safely to earth. No single space project in this period will be more exciting, or more impressive to mankind, or more important for the long-range exploration of space; and none will be so difficult or expensive to accomplish.

U.S.Code Cong. & Adm.News, 87th Cong., 1st Sess., Vol. 1 at 1149, 1157 (1961).

3. Cape Canaveral, at the time of its selection as the lunar launch site was already the site of the Air Force Missile Test Center.

4. A notice of lis pendens was filed on September 28, 1961 in the Circuit Court of Brevard County, Florida, the county in which the tract lay.

5. United States v. Cors, 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); United States v. Miller, 317 U.S. 369, 373–376, 63 S.Ct. 276, 87 L.Ed. 336 (1943); Shoemaker v. United States, 147 U.S. 282, 303–304, 13 S.Ct. 361, 37 L.Ed. 170 (1893); Kerr v. South Park Commr's, 117 U.S. 379, 384–387, 6 S.Ct. 801, 29 L.Ed. 924 (1886). See 4 Nichols, Eminent Domain § 12.3151 (4th ed. 1962).

be taken frequently increases in value; however, the land which is expected to be taken does not legitimately share in this enhancement because its inclusion in the project will make it unavailable for private development. Any enhancement in the value of the land necessarily would result from speculation that the Government might be compelled to pay an artificially inflated price.[6]

Principles applicable to the case before us were enunciated by the Supreme Court in United States v. Miller:

> If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken  *  *  *.
>
> The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising

from the *known* fact that the lands probably would be condemned. (Emphasis added.)[7]

It is important to note the Court's use of the word *known* in the last sentence quoted above. Even though the probability of a given tract's being added to a project is known within the confidential circles of Government planning, if the probability is not publicly disclosed, the tract may realize a legitimate increase in value since a developer contemplating acquisition of the land can make an offer without serious apprehension that the land will be condemned.[8]

The district court conducted a pretrial hearing on the enhancement issue and received extensive evidence concerning the original scope of the lunar landing project at Cape Canaveral. The court viewed the evidence as establishing that the Colton land was within the scope of the project on August 24, 1961, when the original condemnation complaint was filed and that the filing of the complaint was public notice that the Colton land probably would be needed as a part of the "over-all project." Consequently, the court ruled that enhancement in value occurring subsequent to August 24, 1961 should not be considered in determining the market value of the appellant's land. Our review of the evidence received at the pre-trial hearing convinces us that the complaint filed on August 24, 1961 did not disclose a probability that the Colton land would be needed for the project and that the district court's contrary finding is clearly erroneous.

It is undisputed that the 72,644 acres described in the complaint filed August 24, 1961 did not include the Colton land.[9]

---

6. United States v. Cors, 337 U.S. 325, 332–334, 69 S.Ct. 1086 (1949); United States v. Miller, 317 U.S. 369, 377, 63 S.Ct. 276 (1943). *See* 4 Nichols, Eminent Domain § 12.3151 (4th ed. 1962).

7. 317 U.S. 369, 376–377, 63 S.Ct. 276, 281 (1943).

8. *See* United States v. 172.80 Acres of Land, 350 F.2d 957 (3d Cir. 1965).

9. The Government states in answers to interrogatories propounded by the appellant that the determination to take the Colton land was not made until January 7, 1963, and that the determination and purpose of the Government to acquire the land was announced publicly immediately thereafter by the administrator of NASA. The answers further disclose that the date on which prior determination to acquire land for the purposes

Moreover, public testimony given by NASA's Deputy Director, Dr. Hugh Dryden, on September 1, 1961 before the Senate Committee on Aeronautical and Space Sciences clearly indicated that additional acquisitions which might include the Colton land were not anticipated.[10] Dr. Dryden, discussing the factors which led to the selection of Cape Canaveral as the launch site, noted that, unlike some other sites considered, there was no problem at Cape Canaveral with inland waterways. He explained that the Intracoastal Waterway near the Cape was a sufficient distance from the site selected to prevent launch operations from interfering with commercial use of the waterway. The implication of Dr. Dryden's remarks was unmistakable: NASA had no plan for taking any lands which would interfere with use of the waterway. Acquisition of land lying north of Haulover Canal, as did the Colton land, would necessarily create an interference. In June 1962, when NASA decided to acquire the 14,800 acres north of the canal, its officials reappeared before the Senate committee seeking not only funds to acquire the additional acreage, but also funds to relocate the waterway. NASA Director Webb told the committee:

> The relocation of the inland waterway and bridge is necessary because a segment of the intercoastal waterway and the bridge crossing it are within the

acreage to be acquired. It is not considered practicable for safety and other reasons to permit the public to traverse the launching area.[11]

During Deputy Director Dryden's appearance before the Senate committee in September 1961, he exhibited a map of the lands which NASA was seeking appropriations to acquire. The map outlined the 72,644-acre tract which was described in the complaint filed August 24, 1961. Dr. Dryden informed the committee that the appropriation sought would cover all the land acquisition anticipated. This public disclosure by Dr. Dryden is forceful evidence that, as NASA viewed its program on the date of the original condemnation, the appellant's land probably would not be taken. When the committee was approached again in June 1962 for an appropriation to acquire the additional 14,800 acres, Administrator Webb acknowledged that this acreage was not a part of the acquisition for which funds had been sought in September 1961. He stated:

> The immediate need for this land results form the introduction into the presently planned total launch complex facilities the TITAN III program of the Department of Defense. The availability of this additional land will permit more advantageous design and location of the launch facilities for the advanced SATURN and NOVA programs previously planned to be accom-

stated was August 24, 1961 and that on this date, there was no determination that the United States would acquire the lands here involved for the purposes set forth in the condemnation complaint.

10. Hearings Before the Senate Committee on Aeronautical and Space Sciences, 82d Cong., 1 Sess. 4–14 (1961). NASA is authorized by 42 U.S.C. § 2473(b) (3) (1964) to acquire the real property deemed necessary to carry out its function. Congressional enactments approved July 21, 1961 and August 17, 1961 appropriated sums for, *inter alia*, the acquisition of needed lands, but these acts

did not make specific appropriations for the acquisition of a launch site. *See* Pub. L. No. 87–98, 87th Cong., 1st Sess., 75 Stat. 216 (1961); Pub.L. No. 87–141, 87th Cong., 1st Sess., 75 Stat. 342 (1961). In order to avoid extensive reprograming of available funds, NASA officials sought a supplemental appropriation of $60 millions for this acquisition. This requested appropriation was the subject of the Senate Committee hearings.

11. Hearings Before the Senate Committee on Aeronautical and Space Sciences, 82 Cong., 2d Sess. 14 (1962).

modated within * * * [the 72,644-acre tract].[12]

We have searched the record in vain for any Governmental action which would give notice to a prospective real estate purchaser on August 24, 1961 that the Colton land probably would be condemned.[13] The fragmentary evidence found in the record to support a finding that, on that date, acquisition of the appellant's land was in the probable scope of the project is contained primarily in two *confidential* reports compiled by NASA and the Department of Defense prior to the selection of a launch site.[14] One report contains a diagram showing cameras located north of Haulover Canal in the waters of a lagoon.[15] The other report, dealing with the alternatives available for arranging launch pads at Cape Canaveral, contains a diagram indicating that one alternative arrangement would require a small amount of land north of Haulover Canal.[16] It is obvious, however, that these highly classified materials did not serve as public notice of the project's scope.

The record also contains the testimony of project officials who appeared at the pre-trial hearing.[17] The gist of their testimony was that, in August 1961, plans for the lunar landing program were not conclusive and that land requirements were subject to change as the program became more finalized. The Government urges that, because it was necessary during the early stages of the project that planning remain flexible, all lands taken in effecting its over-all purpose should be viewed as having been within its original scope. The persuasiveness of this argument is destroyed, however, by the course of events, discussed earlier, which conveyed to the public the view that project officials knew with certainty the amount of land they needed, *viz.*, the 72,644 acres described in the first condemnation complaint, and that acquisition of additional land was not anticipated.[18]

---

12. *Ibid.* A report concerning the need for additional land at Cape Canaveral, compiled by the Department of the Air Force and dated April 8, 1962, states:

> [T]he * * * decision to purchase 72,000 acres * * * [was] based on the need for three Saturn C–3 launch pads and three Nova launch pads. When orbital rendezvous became the primary mission concept, NASA changed the requirement for three C–3 pads, first to four C–4 pads, and finally to four C–5 pads. This upgrading of vehicle design, and the additional pad requirement increased the total area required for siting the NASA Program. The addition of the Titan III program, coupled with the changing NASA requirement, has resulted in the need to site a total of ten pads on land purchased for six pads.

Air Force Missile Test Center, Land Requirements for MLLP/TITAN III Siting and Future Growth at I–2 (1962).

13. A NASA news release dated August 24, 1961 announced the selection of Cape Canaveral as the launch site for the lunar landing program and stated that approximately 80,000 acres of land would be acquired for the project. However, the condemnation complaint filed on that date described 72,644 acres. The Government's suggestion that this news release was public notice that NASA planned eventually to acquire 87,000 acres, including the Colton land, is at best tenuous.

14. The reports are now declassified and were at the time of the pre-trial hearing.

15. Joint Report on Facilities and Resources Required at Launch Site to Support NASA Manned Lunar Landing Program, Figure 4–D (1961).

16. AMR Development Plan, National Lunar Program, Tab A, Part III, at 11 (1961).

17. Among the witnesses called by the Government were General Leighton Davis, who was commander of the Air Force Missile Test Center at Cape Canaveral in 1961 and Dr. Kurt Debus, who was director of the launch operation directorate of the Marshall Space Flight Center at Huntsville, Alabama in 1961.

18. The appellant suggests that the Government sought on August 24, 1961 to define the scope of the project with a clear, emphatic stroke. The evidence establishes that, indeed, an effort was made to define the project's scope. On August 22, 1961, the Chief of the Justice Department's Land Acquisition Section advised NASA

Although the Supreme Court disallowed compensation for enhanced value in *Miller* and also in Shoemaker v. United States,[19] the result in these cases does not dictate disallowance in the case *sub judice*. In *Shoemaker*, the landowner sought compensation for the increment in value which his land enjoyed subsequent to a Congressional enactment authorizing the establishment of a park for which his land was taken. The land lay within a larger tract *described in the act* as the area from which the park would be carved. Thus, the likelihood that lands lying within the larger tract would be taken was disclosed by the act.[20] In *Miller*, the public project was the construction of a dam which necessitated relocating a railroad. Prior to final Congressional authorization of the project, the likelihood of Miller's property being taken was disclosed when the Government *surveyed* and *staked* one of several alternate relocation routes across his land.[21] In each of these cases, there was public notice from the time of the Government's commitment to the respective projects that the lands in question likely would be taken. On the other hand, in the case now before us, we find that the public actions and utterances of NASA officials indicated that the Colton land likely would not be taken.

The Third Circuit, applying the principles enunciated in *Miller*, allowed compensation for enhanced value in a case which shares substantial factual similarities with the one before us.[22] In that case, the Tottens owned a riparian tract of land 2,000 feet upstream from a proposed dam on the side of the river where originally no public recreational facilities were planned. However, a liberalization of the Government's recreation policy resulted in a decision to acquire the Totten property. In allowing compensation for enhancement prior to the disclosure of this decision to expand the project, the court reasoned that one purchasing the Totten land after the initiation of the reservoir project and prior to the disclosure could do so with a reasonable expectation that the land would not be condemned.

We conclude from an examination of the record before us that a buyer in the real estate market reasonably could expect, prior to June 13, 1962, that the Colton land would not become a part of the lunar landing project, but would enjoy a position proximate to the project. It appears from the evidence that NASA Administrator Webb's testimony before the Senate committee on June 13, 1962 was the earliest disclosure by a project official that the Colton land probably would be taken. Accordingly, we hold that the district court properly should have allowed evidence of enhancement in the value of the Colton land prior to that date.

The appellant asserts that additional errors, unrelated to the issue of enhancement, were committed during the valuation proceeding before the jury.[23] Since this case must be remanded for

officials that the filing of a condemnation complaint encompassing the entire area would be advantageous in later proving the scope of the project for the purpose of denying claims of enhancement.

19. 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893).

20. 147 U.S. at 284, 303–305, 13 S.Ct. 361 (1893).

21. 317 U.S. at 370–371, 63 S.Ct. 276 (1943).

22. United States v. 172.80 Acres of Land, 350 F.2d 957 (3d Cir. 1944) ; *See* Scott

v. United States, 146 F.2d 131 (5th Cir. 1944) ; United States v. Certain Lands, Town of Narragansett, 180 F. 260, 261–262 (D.R.I.1910) ; 1 Orgel, Valuation Under Eminent Domain § 101 (2d ed. 1953).

23. In view of our disposition of the enhancement issue in favor of the appellant, we find it unnecessary to reach the merits of his alternative prayer for relief in which he seeks a jury proceeding to determine the scope of the project. *See generally*, Wardy v. United States, 402 F.2d 762, 763 (1968).

new proceedings, we think it judicially expedient to express our view of those matters.[24]

The district court, in the circumstances of this case, did not abuse its discretion in allowing the Government to prove that the appellant acquired a portion of the condemned land in August 1957 for $200 per acre and that his predecessor in title bought the land in February 1957 for $145 per acre. As we have indicated on previous occasions, this court is relucant to "substitute its judgment for that of the trial court in determining whether a particular sale was too remote in point of time." [25]

Trial counsel for the Government, while examining a witness, made reference to the appellant's having purchased some of the land in question at a tax sale. The court instructed the jury that a tax sale is not a comparable sale and should not be considered as evidence of value, but could be considered as the method by which the land was acquired. We agree with the appellant's contention that, because of its prejudicial nature, evidence of the tax sale should be excluded upon the retrial of this case.[26]

The appellant urges that, since he carried the burden of proof with respect to his property's value, it was error for the court to deny him the privilege of opening and closing the evidence and argument. The Supreme Court has held that the right to begin and conclude the evidence and argument "does not affect the merits of the controversy" and "is not the proper subject of a bill of exception or a writ of error." [27] Without departing from this precedent, we merely would observe that traditional notions of fairness favor giving the privilege of opening and closing to the party who carries the burden of proof.[28]

Finally, the district court did not err in refusing to award the appellant an amount to indemnify him for attorneys' fees and other expenses incurred in the litigation. "Attorneys' fees and expenses are not embraced within [the concept of] just compensation for land taken by eminent domain."[29]

The case is reversed and remanded.

24. *See* SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668, 678–679 (1969); Miller v. International Paper Co., 408 F.2d 283, 288–289 (5th Cir. 1969).

25. Jayson v. United States, 294 F.2d 808, 810 (5th Cir. 1961); International Paper Co. v. United States, 227 F.2d 201, 208 (5th Cir. 1955). The appellant's contention that the district court improperly instructed the jury concerning these previous sales is also without merit.

26. *See* Baetjer v. United States, 143 F.2d 391, 397 (1st Cir. 1944).

27. Day v. Woodworth, 13 Howard 363, 370, 14 L.Ed. 181 (1851).

28. *See* Anderson-Tully Co. v. United States, 189 F.2d 192, 197 (5th Cir. 1951); United States v. Savannah Shipyards, 139 F.2d 953, 955 (5th Cir. 1944).

29. Dohany v. Rogers, 281 U.S. 362, 368, 50 S.Ct. 299, 302, 74 L.Ed. 904 (1930).