STATE OF LOUISIANA, Through the
SABINE RIVER AUTHORITY,
Plaintiff-Appellee,

v.

Lloyd L. LINDSEY, et al.,
Defendants-Appellants.

No. 74–2637.

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1975.

James S. Holliday, Jr., Baton Rouge, La., for defendants-appellants.

W. R. Jackson, Jr., Chris Smith, III, Leesville, La., for plaintiff-appellee.

Before COLEMAN and GEE, Circuit Judges, and COX,* District Judge.

COLEMAN, Circuit Judge.

The District Court adopted the findings of a commission and of a special master, in eminent domain, that the appellant landowners were not entitled to enhancement of the value of their land due to the construction of the Toledo Bend Dam and Reservoir. The issues on appeal are: (1) whether the District Court properly had jurisdiction to hear the expropriation suit; (2) whether the condemnation of Recreational Site # 9 was within the scope of the original Toledo Bend Dam and Reservoir Project; and (3) whether the appellants were entitled to rely on the Louisiana public records doctrine for notice that their land lay within a recreational site.

We find that appellee is entitled to prevail on all three issues and therefore affirm the Judgment of the District Court.

## FACTS

On July 3, 1968, the State of Louisiana, through the Sabine River Authority (SRA), filed suit to expropriate, from the appellant landowners, various tracts of land lying within the vicinity of the Toledo Bend Dam and Reservoir Project. After a hearing in which the appellants' opposition to the validity of the taking was overruled, the District Court, Rule 71A F.R.Civ.P., referred the issue of just compensation to a 3-man commission, with a special master as chairman. The Commission issued its report, finding that the expropriation of land for Recreation Site # 9, in which appellants' land was located, was all part of the *original* Toledo Bend Dam and Reservoir Project and that the appellants were not therefore entitled to any enhancement in value attributable to the construction of the Toledo Bend Dam and Reservoir. The land was valued at $2,430.54 by virtue of its best and highest use as timberland, and appellants were taxed with the cost of the proceedings, in excess of $5,000.

Subsequently, the appellant landowners filed objections to the findings of the Commission and Special Master and obtained an order to stay further proceedings in the District Court, pending a ruling by the State Court on the same issue of law. The elapse of two years brought forth nothing from the State Court, so the District Court recalled its stay order and heard argument on the objections to the Commission's findings. On May 9, 1974, the District Court accepted the findings and conclusions of the Commission and Special Master and rendered judgment for the plaintiff. The landowners appeal.

In 1950 the Sabine River Authority of Louisiana was created by legislative act. Following feasibility studies throughout the 1950's, the SRA of Louisiana and the SRA of Texas on July 6, 1961 entered into a basic contract to construct the Toledo Bend Dam and Reservoir. About a week later the engineering firm of Barnard & Burk was employed for the purpose of advising the SRA on the location, acquisition and development of rec-

* Of the Southern District of Mississippi, sitting by designation.

reational sites. Following inspection of the area, Barnard & Burk on November 3, 1961, submitted a preliminary map showing 17 selected recreational sites. After further study and planning, the SRA on August 14, 1962, approved the sites recommended by Barnard & Burk. On July 3, 1963, the SRA began acquiring land at the dam site, and shortly thereafter the first prints of shoreline survey maps were sent to Barnard & Burk for their use in developing more accurate plans. On March 11, 1964, $125,000 was advanced to apply for planning and acquisition of recreational sites and some land for one of the sites was obtained by voluntary acquisition later that year. On September 28, 1964, the Toledo Bend Joint Operation (SRA of Louisiana and SRA of Texas combined) submitted an application to the Federal Power Commission for approval of the recreational use plan. After requesting additional information, the Federal Power Commission, on April 21, 1967, approved the recreational sites plan and 19 sites were adopted by the SRA, May 10, 1967.

In August of 1967, the appellants became interested in land in the Toledo Bend area for commercial development as lakefront property. Appellants contacted R. D. Morgan (Project Supervisor for Engineering of the Toledo Bend Project) and obtained a map of the area surrounding the land in question. The map did not disclose that the land in question lay in a recreational site. On September 2, 1967, appellants signed a "Purchase Agreement", contingent on the vendor delivering a good and merchantable title. On September 7, 1967, the appellants acquired a new map from Mr. Morgan which disclosed that the land in question was included within a proposed recreation site and appellants were specifically informed of this fact by Mr. Morgan. The land was paid for and title passed to appellants on February 24, 1968. The appellants were officially informed on May 22, 1968, that their

property would be condemned for use as a recreational site, and on July 3, 1968, the suit in expropriation was filed.

## JURISDICTION

Since there is no diversity of citizenship in this case, and the United States is not a party, jurisdiction, if present, will have to be found within the confines of the Federal Power Act.[1] We raised the question of jurisdiction during the oral argument of this case and requested the parties to submit concurrent briefs on the issue. The appellee, SRA, contends that jurisdiction is present under 16 U.S.C., § 814 since a recreational site should be considered a work "appurtenant or accessory" to the dam, reservoir and diversion structure desirable for the benefit of interstate commerce. On the other hand, the appellant landowners contend that jurisdiction is lacking, arguing that 16 U.S.C., § 814 enables a licensee only to acquire, by condemnation in federal court, the lands necessary to construct that part of the project which directly affects navigation, and hence, interstate commerce, i. e., the dam site and inundated areas. They contend that condemnation of any other lands involved in the project is reserved to the "traditional jurisdiction" of the state courts.

Title 16 U.S.C.A., § 814, upon which the SRA relies for jurisdiction, reads as follows:

When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may ac-

1. 41 Stat. 1063, as amended, 16 U.S.C., §§ 791a–828c.

quire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

While not directly on point with the instant case, several cases have discussed the purview of § 814. In *Feltz v. Central Nebraska Public Power & Irr. Dist.,* 8 Cir., 1942, 124 F.2d 578, the licensee was seeking to condemn lands away from the dam and reservoir in order to relocate a United States highway which was to be inundated by the reservoir. The Court held that jurisdiction was proper stating:

> It is apparent that there are no words of the statute which relate in express terms to the problem presented when the development of a project necessitates the removal of such utilities as railroads, highways, streets, or alleys that lie within the project area and the relocation of the same outside of the project area where their use and service to the public may be continued. . . .

> \* \* \* \* \* \*

> It must be conceded that there are situations in which an attempted taking of land may be too remote from the scope of an authorized improvement to be sustained. But in this case we think it resulted from the public interest involved in the maintenance of the public highway as a part of the Highway System of the United States and the public interest in the development of the power and irrigation improvement that the work of highway

relocation aided and contributed in a secondary way and was "accessory" and "in conjunction with" the District's improvement and the District's power to condemn must be sustained . . . . 124 F.2d at 582.

The case of *Chapman v. Public Utility Dist. No. 1 of Douglas Co., Wash.,* 9 Cir., 1966, 367 F.2d 163, involved a Federal Power Commission Licensee who was constructing a hydro-electric project on the Columbia River, totally within the State of Washington. The licensee sought to condemn fee simple title to two tracts of land which lay along the boundary of the project, some of the land being above the maximum pool elevation of the reservoir. The landowner opposed the condemnation on the ground that since some of the land lay above the shoreline of the pool at maximum depth, a flowage easement would fully satisfy the purposes of the licensee and condemnation in fee was therefore unnecessary. The Court held that the licensee had power to condemn in fee the land in question by virtue of 16 U.S.C., § 814. While *Chapman* dealt primarily with the issue of the necessity of taking a fee as opposed to an easement, the fact remains that it was a suit to condemn lands outside of the dam site and reservoir which was maintained in a federal forum by virtue of § 814. The reasoning used by the *Chapman* Court in determining that the licensee had a right to take a fee interest was, *inter alia,* that the recreational requirements imposed on the licensee required it to exercise control over lands adjacent to the reservoir rim.

The question before the *Court in Oakland Club v. South Carolina Public Service Authority,* 4 Cir., 1940, 110 F.2d 84, was whether the licensee could condemn in fee lands for the reservoir (not dam site) and a strip of land 100 feet above the high water mark of the reservoir. The condemnee maintained that the condemnor had no authority under 16 U.S.C., § 814 to take by condemnation a fee simple title to any property except an unimproved dam site, and as to any other property it was authorized by

§ 814 to take only "the right to use or damage the lands". The Fourth Circuit responded by saying "we are satisfied that the Federal Power Act does not restrict the condemnor to the rights and powers of eminent domain specifically enumerated in the Federal Power Act", 110 F.2d at 86. The Court went on to say that the licensee could take advantage of the broader powers allowed under the state law which unquestionably allowed condemnation in fee. They quoted with approval the lower court's holding that § 814 was not an exclusive law of eminent domain but enabled the licensee to exercise in the federal courts the substantive rights granted under state law. Concerning the construction of the Federal Power Act the Court stated:

> The Federal Power Act came to fulfill, not to destroy. It is a remedial statute enacted by the Federal Congress to extend the rights of eminent domain in favor of licensees under the Act. And in statutes of this character, the great dictum of St. Paul: "The letter killeth but the spirit giveth life," seems peculiarly applicable. 110 F.2d at 86.

Again, the situation in *Oakland* did not involve the precise issues that are presented by the instant case but it is important for two reasons. First, a suit was maintained in federal court for condemnation of lands not within the reservoir's inundated area. Secondly, the Court enunciated an interpretation of the Federal Power Act according to its purpose rather than a strictly *literal* interpretation.

The appellant landowners do not question this Court's jurisdiction to entertain expropriation suits to condemn lands "necessary to the construction, maintenance, or operation" of the dam site or reservoir. They do insist, however, that

a federal court lacks jurisdiction to try a suit to condemn lands to develop recreational sites that are totally apart from the dam site and reservoir. The landowners' argument is predicated on a narrow reading of § 814 which they maintain requires that before jurisdiction is conferred on a federal court, the proposed improvement must be "for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce". They then imply that only that part of the project which directly affects navigation can affect interstate commerce.[2] Following through, the landowners contend that the proposed recreational sites do not aid or improve navigation, hence, they do not affect interstate commerce and therefore, do not come within the ambit of federal jurisdiction.

A careful reading of 16 U.S.C., § 814 does not support such an interpretation. The pertinent portions of § 814 read as follows:

> When any licensee cannot acquire by contract . . . the right to use or damage the lands . . . necessary to the construction . . . of any dam [or], reservoir . . . or the works appurtenant or accessory thereto, in conjunction with an improvement which . . . is . . . for the purpose of improving . . . a waterway . . . for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States . . . or in the State courts. . . .

Rephrased the statute simply means that the licensee has the power of eminent domain in federal court to obtain the right to *"use or damage"* any land necessary to the construction of any works *"appurtenant or accessory"* to a dam or reservoir which is connected with

---

2. Some support for appellants' contention is found in an early case dealing with the constitutionality of what is now the Federal Power Act, where the Court stated, "[a] careful read-

ing of the act . . . shows that navigation is the predominant idea of Congress", *Alabama Power Co. v. Gulf Power Co.*, 283 F. 606, 619 (M.D.Ala., 1922).

a waterway improvement that the commission has found to benefit interstate commerce.[3] Although the phrase "use or damage" sounds in terms of easement, we believe that this language is not so restrictive as to prevent the taking of a fee interest by the licensee.[4] If a recreational area can be considered a work appurtenant or accessory to a dam or reservoir, jurisdiction is present.

Section 803 of the Federal Power Act[5] provides that "the project adopted . . . shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway . . . and for other beneficial public uses, including recreational purposes". The Supreme Court has held that the "objective of protecting 'recreational purposes' means more than that the reservoir created by the dam will be the best one possible or practical from a recreational viewpoint", *Udall v. Federal Power Commission,* 1967, 387 U.S. 428, 437, 87 S.Ct. 1712, 1717, 18 L.Ed.2d 869.

Section 2.7, Title 18, Code of Federal Regulations (1975) states that the commission expects a licensee to assume, among others, the following responsibilities:

"(a) To acquire in fee and include within the project boundary enough land to assure optimum development of the recreational resources afforded by the project. To the extent consistent with the other objectives of the license, such lands to be acquired in fee for recreational purposes shall include the lands adjacent to the exterior margin of any project reservoir plus all other project lands specified in any approved recreational use plan for the project.

"(b) To develop suitable public recreational facilities upon project lands and waters and to make provisions for adequate public access to such project facilities and waters and to include therein consideration of the needs of physically handicapped individuals in the design and construction of such project facilities and access."

■  While it is true that the regulations only go to the policy of the Federal Power Act and do not *ipso facto* confer jurisdiction, we can not be blind in our interpretation of 16 U.S.C., § 814 to the obvious policy behind the Act. In light of the policy evidenced in the federal regulations and the Federal Power Act itself, we conclude that recreational areas are properly considered as "appurtenant or accessory" to a dam and reservoir.

■  If the licensee has the power to condemn lands for recreational areas at all, it has the right to do it in federal court. We are of the opinion that the SRA, as licensee, is authorized under 16 U.S.C., § 814 to condemn lands in fee for recreational areas in a federal district court.

---

**3.** We do not find it necessary to determine if the recreational areas by and of themselves benefit interstate commerce. Our interpretation of § 814 is that it only requires that the waterway improvement benefit interstate commerce and that the recreational areas be found to be an accessory thereto.

**4.** *Cf. Chapman v. Public Utility District No. 1 of Douglas Co., Wash.,* 9 Cir., 1966, 367 F.2d 163; *Oakland Club v. South Carolina Public Service Authority,* 4 Cir., 1940, 110 F.2d 84.

**5.** All licenses issued under this subchapter shall be on the following conditions:

(a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval. 16 U.S.C., § 803(a).

*Was Recreational Site # 9 Within the Scope of the Original Toledo Bend and Reservoir Project?*

Having disposed of the jurisdictional issue, we move to the merits of the case.

The first issue is whether Recreational Site # 9 is a separate and distinct project from the original Toledo Bend Dam and Reservoir Project.

In support of their position the appellants allege the following facts:

(1) The intention of the SRA that the recreation and dam projects be separate is shown by the definition of the term project in the original basic contract between the SRA of Louisiana and Texas which provides "that 'project' shall not include any recreational facilities . . . incidental to the construction and operation of said Toledo Bend Dam and Reservoir".

(2) The ownership and control of the dam and reservoir is vested in the combined SRA of Texas and Louisiana while the recreation areas are owned and controlled by each state separately.

(3) The location of the sites were never certain until May 10, 1967, the date of formal adoption by the SRA, being until then only recommended.

Appellee SRA, on the other hand, contends that the dam, reservoir and recreation construction was all one vast project and that the land was expropriated in an orderly fashion, accomplished over many years due to the large scale of the project.

The three-man commission and special master relied, *inter alia*, on the following facts to arrive at their conclusion that the taking of appellants' property for Site # 9 was within the scope of the original project:

(1) The project was a long range undertaking and Site # 9 had been proposed since the early period of the project.

(2) The 1960 Constitutional amendment establishing the SRA provided that the "Authority may acquire, develop and provide recreational facilities for the use of the public".

(3) Site # 9 was included on the first maps drawn in 1961 and was submitted as a proposed site to the Federal Power Commission in 1964.

(4) All expropriation suits for both the dam and recreation areas were brought by the same authority in an orderly fashion with the recreational sites taken last.

(5) All revenues of the project, including those from recreational uses, are pledged to repay revenue bonds borrowed to pay for the entire project.

The SRA, as licensee of the Federal Power Commission, is exercising its eminent domain power pursuant to 16 U.S.C., § 814, the last sentence of which prescribes that the "practice and procedure" in any eminent domain action in the federal district court "shall conform as nearly as may be with the practice and procedure" in a similar action in the state courts in which the land is located.[6]

The Louisiana Constitution, of course, provides that private property shall not be taken except after just and adequate compensation is paid, LSA–Const. Art. 1, § 2. The measure of compensation is governed by LSA–R.S. 19:9 which provides:

In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed,

---

**6.** Although the wording of § 814 appears to govern only procedural law and not any substantive law, there is authority to the contrary. *See Grand River Dam Authority v. Grand— Hydro*, 1948, 335 U.S. 359, 374, 69 S.Ct. 114, 121, 93 L.Ed. 64; *Central Nebraska Public Power & Irr. District v. Harrison*, 8 Cir., 1942, 127 F.2d 588, 589 (*semble*). We do not indicate any view on this point since we find no conflict between Louisiana and Federal substantive law.

without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work.[7]

■ Federal common law provides for basically the same measure of compensation as does Louisiana law. *See United States v. Reynolds,* 1970, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12; *United States v. Miller,* 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; *Shoemaker v. United States,* 1893, 147 U.S. 282, 304–05, 13 S.Ct. 361, 392–93, 37 L.Ed. 170. Thus, it is clear that under both Louisiana law and federal law a landowner is not entitled to any enhanced value to his property attributable to the public project which makes the condemnation necessary. The question in the instant case then is reduced to whether the taking of appellants' property for the construction of Recreational Site # 9 was a part of the original Toledo Bend Dam and Reservoir Project or a distinct and separate project. If the taking of the recreational site is a part of the original Toledo Bend Dam and Reservoir Project, the landowners will not be entitled to any enhancement of value caused by the construction of the Toledo Bend Dam and Reservoir.

A legal test devised to determine this situation, known as the "scope-of-the-project" test, was stated by a unanimous Court in *United States v. Miller,* 1943, 317 U.S. 369, 376–77, 63 S.Ct. 276, 281, 87 L.Ed. 336, as follows:

If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of

proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.

The test has been declared by the Louisiana Court of Appeals to be the applicable law in situations similar to the case at bar. *See State, Dept. of Highways v. Port Properties, Inc.,* La.App., 1975, 316 So.2d 749, 756–57; *State, through Dept. of Highways v. Martin,* La.App., 1967, 196 So.2d 63, 67.

■ The Supreme Court recently reaffirmed the validity of the "scope-of-the-project" test and refined it, declaring that there was no requirement that the land ultimately taken be actually specified in the original project plans but only that it be shown that during the

7. *See also* LSA–C.C. art. 2633; *State, Dept. of Highways v. Trippeer Realty Corp.,* La.1973, 276 So.2d 315, 319; *Shreveport Traction Co. v. Svara,* 133 La. 900, 63 So. 396 (1913); *Opelousas G. & N. E. Ry. Co. v. St. Landry Cotton Oil Co.,* 118 La. 290, 42 So. 940 (1907); *Louisiana Ry. & Navigation Co. v. Xavier Realty,* 115 La. 328, 39 So. 1, 6 (1905); *State, Dept. of Highways v. Port Properties, Inc.,* La.App.1975, 316 So.2d 749, 755; *State v. Johnson,* La.App.1962, 141 So.2d 54, 56.

course of the planning it became evident that the land would probably be needed for public use, *United States v. Reynolds*, 1970, 397 U.S. 14, 21, 90 S.Ct. 803, 25 L.Ed.2d 12. This Court has also explained that it is not enough that it became evident within the confidential circles of government planning that certain property would be taken. It must also be evident to the public that a given tract might be taken for the project, *United States v. 2,353.28 Acres of Land, Etc., State of Fla.*, 5 Cir., 1969, 414 F.2d 965, 968.

In *United States v. Crance*, 8 Cir., 1965, 341 F.2d 161, a case similar to the case at bar,[8] the Court found that the government's taking of recreational sites which had not been proposed at the outset of the project was still probably within the scope-of-the-project and therefore, the landowner was not entitled to any enhancement. In *Crance, supra*, at 164–65, the Court stated:

Neither the fact that a line on a map tentatively projecting the reservoir boundary at the Crance location nor the fact that other recreational sites were approved prior to the selection of the Crance property would justify application of a different and higher standard of evaluation to the Crance property. To hold, in effect, on a project of this type that simply because this particular tract of land was not delineated on a map at the time of appropriation of funds for the project by Congress, it had been excluded, would be giving undue weight to the proposed diagram of the reservoir plan. Actually, there is no practical way to absolutely delineate with finality the areas abutting the reservoir line at the inception of the project which would be most suitable for recreational purposes. Extensive engineering studies must first go into the planning for the dam and reservoir. Moreover, the fact that the proposed perimeter of the reservoir was changed from the boundary depicted by the map that existed at the time of congressional authorization after subsequent engineering study demonstrates this very problem.

\* \* \* \* \* \*

The dam and reservoir are the more important aspects of the project and their space requirements in the instant situation necessitated the dislocating of four hundred families. Not until the reservoir lines are finalized, can there be a practical final determination as to the number and location of the necessary recreational sites.

The significant factor here is that this project contemplated recreational areas from its very inception and certainly property lying beyond a perimeter of the reservoir would probably be incorporated for recreational purposes if the land acquired for the reservoir alone was not also sufficient for recreational utilization. Since the Crance property abutted the reservoir line, it was within the sphere of probable acquisition for recreational use.

While we do not necessarily adopt the rather broad statement in *Crance* that property for a recreational site would be within the scope of the project simply because it abutted the reservoir line, we cite it to show that the project scope is not to be narrowly interpreted.

■ In the case at bar, Recreational Site # 9 was included on the first maps drawn in 1961, was submitted as a proposed site to the Federal Power Commission in 1964, and remains a site today. The appellants argue that the site was subject to change until it was finally adopted in 1967. However, the undisputed fact remains that the site was never changed and was made final nine months before the appellants bought the property.

As with any test that deals with probabilities, the test is resolved by applying one's best judgment to the facts at hand.

---

8. *Crance* was not brought under the Federal Power Act as was the instant case, since in *Crance* the United States was the condemnor.

From the facts adduced before the Commission, we cannot say that their finding that there was only one project was clearly erroneous.

### Were Appellants Entitled to Rely on the Louisiana Public Records Doctrine?

■ Appellants' final argument is that since a description of the land to be expropriated for Recreational Site # 9 was not recorded in the Parish records then by virtue of LSA–R.S. 9:2721[9] they are protected against any claim arising outside the public records. They cite *McDuffie v. Walker*, 125 La. 152, 51 So. 100 (1909) and *Kinchen v. Kinchen*, La. App.1970, 244 So.2d 316 for the proposition that one who, upon faith on the public records, purchases real estate, the record title to which stands in the name of his vendor, is entitled to be protected in his purchase against any claims arising outside the public records. The Court in *Kinchen, supra*, at 318, declared the rule to be:

> The rule in McDuffie is based on the fundamental premise that public policy requires *stability in the titles* to real property to the end that marketability thereof will not be impaired and property not be taken out of commerce. To achieve this goal, the law prescribes one test for the marketability of real property, namely, the public records. With this concept in view,

our jurisprudence establishes that acquisition of *clear title* to immovable property can be defeated only by knowledge afforded by the public records or by a successfully proferred allegation of fraud. (Emphasis added).

Again, appellants' argument must fail. The question is not whether their title can be defeated, for they admit the superior power of the SRA to condemn and take the land; the only question is whether the appellants were given "just compensation". Appellants' claim against the SRA has nothing to do with title to the land but only with the price they received for it.

■ We have been cited to no laws, nor have we found any, that require a condemnor to place a description of the land he proposes to condemn in the Parish records. In condemnation proceedings when enhancement is an issue the only requirement is that the probability that the land may be taken shall be publicly disclosed. *See United States v. 2,353.28 Acres of Land*, 5 Cir., 1969, 414 F.2d 965, 968.

In the instant case the appellants had actual notice that the land they desired to purchase lay within a recreation area.[10]

For the reasons hereinabove stated, the judgment of the District Court is

Affirmed.

---

**9.** § 2721. Filing in office of parish recorder

No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties.

**10.** The appellants opine that they were bound by a "purchase agreement" before they discovered that their desired land was in a recreational area. But the record reveals that the purchase agreement was contingent on delivery of a good and merchantable title. The appellants paid for and accepted title to the land five months after they learned that the land lay in a recreation area.